2 F.3d 870
 62 USLW 2119
 UNITED STATES of America, Plaintiff-Appellee,
v.
Juan Dale REESE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Scott Matthew DWYER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Daniel Wayne BROUSSARD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry Marcel HOUSTON, Defendant-Appellant.
 Nos. 91-10360 to 91-10362 and 91-10422.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 15, 1992.
Decided July 27, 1993.
 
 Victoria C. Belco, Berkeley, CA, for defendant-appellant Reese.
 Michael A. Levy, Berkeley, CA, for defendant-appellant Dwyer.
 J. Frank McCabe, Goorjian & McCabe, San Francisco, CA, for defendant-appellant Broussard.
 George C. Boisseau, Santa Rosa, CA, for defendant-appellant Houston.
 Albert S. Glenn, Asst. U.S. Atty., San Francisco, CA, for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before: GOODWIN, O'SCANNLAIN, and RYMER, Circuit Judges.
 O'SCANNLAIN, Circuit Judge.
 
 
 1
 A jury convicted appellants of federal civil rights crimes stemming from their actions as Oakland Housing Authority police officers. Their appeals raise a number of difficult questions, among them certain matters of first impression. We are required to decide what the government must prove to convict a law enforcement officer of depriving an individual of his federal constitutional right to be free of excessive force during detention or arrest. We also must decide whether criminal liability may be imposed on a commanding police officer who fails to prevent the use of excessive force by officers under his command.
 
 
 2
 * The Oakland Housing Authority (the "OHA") is a municipal agency that provides housing to low income residents in Oakland, California.[1] The Oakland Housing Authority Police Department (the "OHAPD") provides security and police services to the residents of OHA properties. Prior to the events with which we are here concerned, the OHAPD consisted of some two dozen officers, including one chief, three sergeants, and one corporal.
 
 
 3
 Among the properties administered by the OHA were large public housing developments plagued by high levels of drug activity, much of it involving crack cocaine. In April 1989, a special drug suppression task force (the "Task Force") was created within the OHAPD using funds provided by a federal grant. Six new officers were hired to man the Task Force, among them appellants Reese, Dwyer, and Houston. Officers Garden, Barryer, and Yee were the remaining members.[2] Appellant Broussard, already an OHAPD sergeant, was chosen to command them.
 
 
 4
 The Task Force operated as an independent unit within the department. The group was not assigned responsibility for patrolling any particular area, but was left free to deal with narcotics problems wherever they arose on OHA property. It held its daily group meetings apart from the regular OHAPD patrol officers. Its members worked on a single shift.
 
 
 5
 At Broussard's direction, the Task Force officers acted together virtually at all times while in the field. Typically, they would go out in two or three vehicles, drive up to an area on or near OHA property where they suspected drug activity, jump out of the vehicles, and, in the words of Officer Barryer, "just take anything and everything we saw on the street corner ... more or less like a wolf pack."
 
 
 6
 Broussard offered guidance to the men under his command in a number of respects around the time when the Task Force was first assembled. He told them, for example, that a lot of "dirty" drug money would be passing through their hands, and that it would not really matter if they kept some of it for themselves. The suspects, he noted, would be in no position to complain if some of their money came up missing. He also regularly exhorted Task Force officers to keep their arrest numbers up. All the officers were aware that the federal grant that funded their unit, and on which their jobs depended, was good for only eighteen to twenty-four months. Broussard warned that they would need statistics to show that the federal money was well spent and thus to secure another grant. On more than one occasion, he sent the Task Force out to begin a shift with comments like, "Let's go out and kick ass," and "[E]verybody goes to jail tonight for everything, all right?"
 
 
 7
 We turn now to the various incidents that were part of the government's case at trial, whether charged as individual substantive violations or as overt acts in furtherance of appellants' alleged conspiracy.
 
 
 8
 On May 8, 1989, during the Task Force's first night on patrol, Dwyer and Garden chased and caught a fleeing suspect in a parking lot. The two officers had the suspect on the ground and were beating him when other Task Force members stepped in; he did not appear to be resisting. Dwyer then walked the suspect over to one of the patrol cars and slammed him against it abruptly, so that his face and chest came down on the hood, even though the suspect was under control and in handcuffs at the time. Yee then pulled the suspect away from Dwyer, and the suspect was arrested for loitering. At the Task Force's briefing the next day, Dwyer told Yee he did not appreciate having his "investigation" interfered with.
 
 
 9
 Garden received a cut on his face during this incident. In response, Broussard told his assembled officers that any suspect who injured a Task Force member had better end up going to the hospital himself. On other occasions, Broussard admonished his men that, if a suspect were to run from them, they should "catch him [and] whip his ass." "No one runs," Broussard told another OHAPD sergeant. "Those who run will pay."
 
 
 10
 On May 16, 1989, at about 2:00 p.m., Jackie Dailey was helping to fix the car of an OHA resident, across the street from his own residence. Task Force members arrived on the scene and ordered Dailey and the other individuals present to stand spread-eagled against the car while they were searched and their names checked for outstanding warrants. No such warrants were found, and the search revealed no contraband. Reese then approached Dailey and told him that he found the hat Dailey was wearing offensive. The hat had the words "One Pimp, six holes" written on it. Reese took the hat off Dailey's head, ripped it, and threw it on the ground. He then seized Dailey by the neck and the back of the pants and threw him against the police car, then lifted him and threw him to the ground twice in succession. Houston then arrested Dailey for loitering. Broussard, the supervisor in charge at the time, was present at this incident and watched it develop, but took no steps to intercede.
 
 
 11
 After his release from jail, Dailey went to a hospital emergency room, where an x-ray was taken. He was later diagnosed as having sustained a fracture of his right elbow. Pain medication was prescribed and his arm was placed in a sling, which prevented him from filling out the complaint form he wished to file with the OHA--a friend had to write out the complaint for him.[3]
 
 
 12
 On May 19, 1989, Dwyer attempted to place a suspect in the back seat of a patrol car. He found himself unable to do so because another suspect, Bryan Kiel, already in custody and handcuffed, had fallen asleep there. Dwyer twice told Kiel to move, then, receiving no response, kicked him hard in the chest.
 
 
 13
 A meeting involving the members of the Task Force and the chief of the OHAPD was held in the wake of this incident. The chief told the officers that the use of unnecessary or excessive force would not be tolerated, that Dwyer had come close to being terminated, and that any officer guilty of using excessive force in the future would be. After the chief left, Dwyer confronted Yee, saying he would hold him directly responsible if he were fired. Houston then told Yee that he was not a team player and was not aggressive enough. Reese added that, while he had no problems with Yee personally, he "felt he had to watch his back and look over his shoulder when [Yee] was around, because he was afraid [Yee would] say something." Both Reese and Houston told Yee he should consider leaving the Task Force.
 
 
 14
 Broussard, who had said little to that point in the meeting, then stated that "team business should remain team business," that matters involving Task Force members were the Task Force's own affair, and that no one else need know about them. On this and other occasions, Broussard told his officers that "team business" was not to be discussed with OHA patrol officers. Any Task Force member who had a problem with this, he added, would be "severely dealt with" by Broussard himself.
 
 
 15
 On May 23, 1989, Barryer conducted a pat search of Demetrius Findley. Barryer found nothing, and was prepared to release the suspect, but Broussard told him to continue the search. Barryer eventually discovered a plastic baggie containing suspected rock cocaine underneath Findley's testicles.
 
 
 16
 Barryer believed, however, that he had not had probable cause to conduct such an extensive search. He and Broussard discussed the problem of how to write up the arrest report in such a way as to make the search appear valid. Barryer proposed saying that he had felt something like a weapon in Findley's pants, but Broussard rejected this idea on the grounds that it would not provide a strong enough case. Barryer then indicated that he would simply say that he had seen Findley throw the cocaine on the ground. "Yeah, that'll work," Broussard said. Barryer wrote up his report in these terms, and Broussard read and approved the report.
 
 
 17
 The following month, Barryer was subpoenaed to testify in court in connection with the Findley arrest. Upon meeting with the deputy district attorney, however, Barryer indicated that he would be unable to testify to what he had said in his arrest report because it was false. He was then released from his subpoena.
 
 
 18
 Barryer returned to the OHAPD where he related these events first to the chief and then to Broussard. Broussard insisted that Barryer should have testified to what he had written in the report, saying, "Who do you think they're going to believe, you or the dirt bag?" Barryer was fired two weeks later for having falsified his report.
 
 
 19
 On the night of June 1, 1989, a Task Force patrol car carrying Barryer, Dwyer, and Reese crashed into a backstop while pursuing David McClendon across a baseball field. Barryer, the driver of the car, chased McClendon on foot up an adjacent street, then caught him and threw him to the ground. Dwyer arrived promptly thereafter. Barryer had McClendon under control and was preparing to handcuff him when Garden's voice came through over his radio saying that Reese had been injured in the crash. Dwyer then hit McClendon on the top of the head with his flashlight, causing a wound that required twenty-five stitches to close.
 
 
 20
 McClendon was brought back to the ball field, where Broussard's attention was drawn to the bloody wound on his head. Broussard then stated that McClendon would have to be arrested for something in order to justify his injury and his trip to the hospital. Garden wrote a false report stating that he had seen McClendon discard rock cocaine while running from Task Force officers, and that he had dropped a package of narcotics while being transferred from one patrol car to another.[4]
 
 
 21
 On June 2, 1989, Task Force members stopped Edward Jackson, a juvenile, walking across a parking lot. Reese searched Jackson, including his underwear, but found nothing and told him to go. Broussard then produced a plastic bag of rock cocaine from a nearby hole in the ground. Jackson denied the drugs were his, but was arrested anyway. Reese wrote a report stating that he and Garden had observed Jackson for some fifteen minutes, and had seen him return frequently to the hole in the ground, where he inspected a plastic bag and removed things from it. The report was false.
 
 
 22
 Later that month, Jackson came up for trial in juvenile court. Garden, reading the report Reese had written for the first time on the day of the trial, told Reese they were going to have to get their stories together. They met during breaks in the trial, and visited the scene of the arrest during the lunch recess, agreeing upon the content of their testimony. Jackson was found guilty of possessing cocaine for sale. On returning to OHAPD headquarters, Garden and Reese told Dwyer that they had "lied [their] asses off in court" that day.[5]
 
 
 23
 On the evening of June 29, 1989, Glen Losh was sitting with his girlfriend in his pickup truck, parked near OHA property. The Task Force, with all appellants present, pulled up behind them. Reese removed Losh from the truck and frisked him, then directed him to cross the sidewalk and to place his hands above his head against a fence. Reese then asked Losh what he was doing in the area. When Losh replied that he was there to sell an extra car battery he had acquired, Reese accused him of lying, and struck him with the heel or palm of his hand in the ribs on both sides of his body, knocking the wind out of him and causing him to fall to his knees.[6]
 
 
 24
 Reese then frisked Losh again and removed his billfold and $30 in cash. He asked again why Losh was in the area, and what he, a white person, was doing in a black neighborhood. Reese then held up Losh's money--a twenty-dollar bill and two five-dollar bills--and said, "It looks like you have ten dollars." Reese threw the two fives on the ground, and put the twenty in his pocket. Losh never received the money back.
 
 
 25
 Garden and Broussard searched Losh's truck. Garden found a mirror, a gold razor blade, and a gold straw, items that he considered to be cocaine paraphernalia, which he smashed in the street. Garden confronted Losh about these items, pulling his beard and backhanding him across the mouth to get his attention. Houston, meanwhile, came over and questioned Losh further regarding his presence in the area, striking him in the lower back near the kidneys more than once. Losh was not arrested.
 
 
 26
 During this same shift, early on the morning of June 30, 1989, the same Task Force officers encountered Rosie Verduzco and her husband Salvador. The two were sitting in their car, parked near OHA property in front of the home of Salvador's parents; Salvador was talking to his brother David Verduzco and his cousin Michael Guzman, who stood on the sidewalk. Arriving on the scene, the officers ordered Rosie and Salvador to get out of their car and to place their hands on the roof, which they did.
 
 
 27
 Rosie was searched and her identification was taken by one of the officers. She then asked Houston, who was standing to her left, what the problem was. He responded by saying, "Shut up, bitch." Rosie kept asking questions, and Houston repeatedly responded with the same phrase. Eventually, Houston grabbed Rosie's hair, then yanked her head back over her shoulder so that she was looking at him. He did this several times. At no time did Rosie take her hands off the roof of the car or make any moves toward Houston. Finally, Houston shoved Rosie against the side of the car and struck her on the head with his flashlight. The laceration bled profusely and later required two staples to close. Rosie was arrested for resisting arrest and for having an open container in her car. Broussard was standing five to ten feet behind Houston as this incident unfolded.[7]
 
 
 28
 Meanwhile, Salvador stood spread-eagled on the opposite side of the car, his legs apart and his hands on the roof. When he protested against Houston's treatment of his wife, Dwyer kicked him in the testicles from behind, telling him to shut up, and adding, "How do you like that, wetback"? Salvador was not arrested.[8]
 
 
 29
 The OHA received numerous citizen complaints regarding the conduct of OHAPD officers during the period between May and July 1989. On one occasion, OHAPD Sergeant Watson spoke to Broussard about complaints alleging the use of excessive force. Broussard said he was not aware of any such problems involving the members of the Task Force, but he would bring the matter to the attention of his men. Watson also spoke to Dwyer, Houston, and Reese about the complaints, and told them not to use more force than was necessary, and to document properly any incident in which they resorted to force.
 
 
 30
 When the other OHA sergeant, Sergeant Santiago, spoke to Broussard about the increased number of citizen complaints, he was told: "Don't worry about it. They're just dope dealers and ... they don't have any complaint." Asked specifically about the complaints filed by Glen Losh and his girlfriend, Broussard said, "Oh, they were just out there to buy dope." On one occasion, when Broussard was delayed in arriving at work, Santiago convened a special joint briefing session of the Task Force and regular patrol officers. He discussed the influx of internal affairs complaints about excessive force and the theft of money and property, and warned the officers that such conduct would not be condoned, and could lead to an investigation by an outside agency.
 
 
 31
 On August 13, 1989, Task Force officers encountered a group of black males. Searching the area across the street from the group, Garden found a box containing baggies of marijuana. Reese and Broussard conferred, and Reese then asked whose box it was. When no one stepped forward, Reese announced that whoever was carrying the most money would go to jail. That person proved to be David Lyles, a juvenile, and he was promptly arrested. Reese wrote up an arrest report in which he stated that he and Garden had seen Lyles holding the box, and that Lyles had dropped the box and crossed the street when he saw the officers' vehicle pull up. This was untrue. Nonetheless, Reese and Garden both testified in court to what Reese had written, and Lyles was found guilty.[9]
 
 
 32
 On August 25, 1989, acting on the basis of information received earlier that day, Reese and Houston stopped a car driven by Cliofus Soluno, a suspected drug supplier. Broussard, Garden, and Dwyer joined them, and Soluno's trunk was searched. A large amount of marijuana and $2000 in cash was found in the trunk. Observing that Soluno, an undocumented alien from Mexico, would not miss the money, the five officers divided the cash among themselves.[10]
 
 
 33
 On or about September 23, 1989, Task Force members chased and caught a suspect in a field. No drugs were found on his person or anywhere near him. Dwyer went to the trunk of his patrol car, and retrieved a baggie containing three pieces of rock cocaine. Dwyer then wrote an arrest report stating that these drugs had been taken from the suspect. Houston and Garden, as well as Dwyer, maintained "stashes" of narcotics which they used against suspects at various times.
 
 
 34
 On the night of October 7, 1989, Jerry Watkins was walking down the street in a neighborhood known as a "heavy drug area," looking for his stepson. Dwyer jumped out of a civilian car, and, without identifying himself as a police officer, yelled at Watkins, "Come here, you son of a bitch, [or I'll] kill you." Frightened, Watkins attempted to escape through a backyard. Dwyer, however, caught up with him and struck him in the head with his flashlight as he attempted to climb through a hole in a fence. The wound Watkins received later required eight to ten stitches. Dwyer wrote a report stating that Watkins had dropped a piece of rock cocaine while attempting to flee; he submitted what he said was this cocaine into evidence. This report was false.[11]
 
 
 35
 On October 26, 1989, the Task Force stopped Keith Rogers. Dwyer began to search him for drugs and found a small baggie of marijuana. Dwyer continued the search, but Rogers grew belligerent when Dwyer moved to search his underwear. In response, Dwyer tried to rip Rogers' underwear off him, then used a buck knife to cut it off, saying, "Fuck your rights. What about your rights now?" Broussard then directed the officers to drive Rogers to an area outside a closed OHA complex. Arriving there, the officers bent Rogers over the front of a patrol vehicle and held him there. Dwyer put on a pair rubber gloves and said, "The doctor is in," then proceeded to perform a rectal search on Rogers. Rogers was visible from the street during this search. No drugs were found.
 
 
 36
 On November 1, 1989, Task Force officers on patrol observed two black males looking into a brown paper bag. When the men saw the officers' vehicle, they fled. The bag turned out to contain a large amount of rock cocaine, and Sherman Gay was arrested for its possession by Task Force Officer Williamson.[12] Broussard explained to Williamson and Garden that Gay was a big time drug dealer and that he "definitely" needed to go to jail in connection with the drugs. A discussion ensued among the three officers regarding what Williamson should write in his arrest report, and Williamson suggested that he could write up the arrest as an observed hand-to-hand drug transaction. Williamson wrote the report accordingly, even though he had observed no such transaction.
 
 
 37
 By November 1989, the activities of the Task Force had prompted an investigation by the Oakland Police Department and the Alameda County District Attorney's Office. As part of the investigation, several videotaped undercover operations were conducted. Generally these operations involved an undercover officer, carrying a pager and a predetermined sum of money, standing on the sidewalk near OHA property with drugs placed somewhere nearby. The investigating officers would then call the OHA dispatcher to complain about the "drug dealer" who was working in that area, giving the undercover agent's description. The jury viewed a number of these videotapes as evidence in appellants' trial.
 
 
 38
 On November 14, 1989, Officer Robert Pursley was working undercover in one of these operations. The drugs had been placed in a cigarette package; Pursley stood near the package, and once sat down next to it. Meanwhile, across the street from Pursley, genuine drug deals were being conducted by one Billy Cooley.
 
 
 39
 The Task Force was dispatched to the scene. Garden told Pursley to get on the ground, then went across the street to Cooley. Dwyer then approached Pursley, straddled him and told him to roll over onto his back. Pursley rolled over with his arms extended, whereupon Dwyer hit Pursley in the hands with his flashlight and told him never to raise his hands to him again. Dwyer then kicked Pursley in the ribs, and grabbed him by the throat and started choking him, without provocation.[13]
 
 
 40
 On November 21, 1989, Officer George Elzie assumed the role of the undercover agent in this operation, and was arrested by Reese. Elzie had been given $630 prior to being placed in the field. Together, Reese and Houston removed all of this money from Elzie's pockets. However, Reese turned in just $280, and claimed in his arrest report that this was all that had been recovered from Elzie. The rest of the money was never accounted for.[14]
 
 
 41
 On November 24, 1989, Dwyer and Garden arrested Darnell Wordlow. Wordlow was wearing a hooded jacket, and Dwyer wrapped its drawstrings around his throat so tightly that Wordlow began to choke. Wordlow, having been handcuffed, could not loosen the strings, nor could any of the officers present manage to untie them; Garden was eventually forced to cut them with a pocket knife. Placing Wordlow in the back seat of the patrol car, Dwyer punched him repeatedly in the jaw, sending Wordlow into some kind of seizure. Wordlow had offered no resistance to Dwyer.[15]
 
 
 42
 On the basis of these incidents among others, appellants were tried by jury under a nineteen count indictment. The first count charged all four appellants with a criminal conspiracy whose object was the deprivation of constitutional rights, in violation of 18 U.S.C. Sec. 241. The jury returned a verdict of guilty on the conspiracy count. The other counts delineated the specific substantive violations of these rights committed by the individual officers, in violation of 18 U.S.C. Sec. 242. The jury voted to convict on most of these counts. In particular, each appellant was convicted for his role in one or more episodes involving excessive force.
 
 
 43
 Appellants were sentenced under the Guidelines to terms ranging from thirty-six to ninety-six months. They filed timely notices of appeal. A panel of this court subsequently granted their motions for bail pending appeal.
 
 II
 
 44
 The fundamental question raised in these appeals is whether the district court's instructions to the jury properly set forth the law applicable to a criminal prosecution for federal civil rights violations. The relevant statutes are 18 U.S.C. Sec. 241, originally enacted as the Enforcement Act of 1870, and 18 U.S.C. Sec. 242, which derives from the Civil Rights Act of 1866. See United States v. Price, 383 U.S. 787, 800-20, 86 S.Ct. 1152, 1160-70, 16 L.Ed.2d 267 (1966). In their present form, these statutes establish criminal penalties (1) for conspiring to "injure" another "in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States," 18 U.S.C. Sec. 241, and (2) for acting "willfully" "under color of any law" to "subject" another "to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 18 U.S.C. Sec. 242. In interpreting these enactments, the Supreme Court's plurality opinion in Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), remains the touchstone for analysis.[16]
 
 
 45
 The defendants in Screws challenged their convictions under section 242 on the grounds that the statute was unconstitutionally vague, arguing that it lacked an "ascertainable standard of guilt" insofar as it mandated criminal penalties for acts in violation of whatever rights might be protected by the "broad and fluid definitions" of the Due Process Clause. Id. at 95, 65 S.Ct. at 1032. The Court acknowledged that section 242 might well be impermissibly vague if it were interpreted to require only general criminal intent to support a conviction. The general standard of intent holds that "[i]f a man intentionally adopts certain conduct in certain circumstances known to him, and that conduct is forbidden by the law under those circumstances, he intentionally breaks the law in the only sense in which the law ever considers intent." 325 U.S. at 96, 65 S.Ct. at 1033 (quoting Ellis v. United States, 206 U.S. 246, 257, 27 S.Ct. 600, 602, 51 L.Ed. 1047 (1907)). Permitting guilt under section 242 to turn on this standard of intent, the Court suggested, could allow a law enforcement officer to be punished for doing "an act which some court later holds deprives a person of due process of law," id., 325 U.S. at 97, 65 S.Ct. at 1033, casting serious doubt on that section's constitutionality.
 
 
 46
 The Court nonetheless turned back the defendants' challenge. It did so by construing section 242's reference to "willfulness" as requiring proof of "specific intent" in order to sustain a conviction for federal civil rights violations. Specific intent, according to Screws, "is an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." 325 U.S. at 104, 65 S.Ct. at 1037. The Court explained that, so construed, section 242 would authorize punishment "only for an act knowingly done with the purpose of doing that which the statute prohibits," so that "the accused cannot be said to suffer from lack of warning or knowledge that the act that he does is a violation of law." Id. at 102, 65 S.Ct. at 1036. Accordingly, this construction "saves [section 242] from any charge of unconstitutionality on the grounds of vagueness." Id. at 103, 65 S.Ct. at 1036. By the same token, the specific intent requirement prevents the statute from "becom[ing] a trap for law enforcement agencies acting in good faith." Id. at 104, 65 S.Ct. at 1037.
 
 
 47
 The meaning of "willfulness" and "specific intent" are thus of central importance in the resolution of these appeals.[17] In Screws, the Court made clear that "it was not sufficient that petitioners had a generally bad purpose. To convict it was necessary for [the jury] to find that petitioners had the purpose to deprive the prisoner of a constitutional right...." 325 U.S. at 107, 65 S.Ct. at 1038. Yet the decision then goes on to say that "[t]he fact that the defendants may not have been thinking in constitutional terms is not material" to whether they acted willfully within the meaning of the statute. Id. at 106, 65 S.Ct. at 1037. Screws thus offers us a paradox: it tells us that one may act with the specific intent to violate a constitutional right without "thinking in constitutional terms"; that is, that one may have "the purpose to deprive [another] of a constitutional right" without knowing that the Constitution guarantees any such right. Yet how can one intend to deprive another of a right if one does not know that right exists?
 
 
 48
 The paradox resolves itself through the Court's explanation that to "act willfully in the sense in which we use the word [is to] act in open defiance or reckless disregard of a constitutional requirement that has been made specific and definite." Id. at 105, 65 S.Ct. at 1037 (emphasis supplied). See United States v. Dise, 763 F.2d 586, 592 (3d Cir.) (noting that the "superficially conflicting mandates of Screws are reconciled by the Court's recognition that willfulness encompasses 'reckless disregard of a constitutional requirement' "), cert. denied, 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 341 (1985). The meaning of "reckless disregard," meanwhile, can be gleaned from the following passage:
 
 
 49
 [I]t is plain that basic to the concept of due process of law in a criminal case is a trial--a trial in a court of law not a "trial by ordeal." ... Those who decide to take the law into their own hands and act as prosecutor, jury, judge, and executioner plainly act to deprive a prisoner of the trial which due process of law guarantees him.
 
 
 50
 Screws, 325 U.S. at 106, 65 S.Ct. at 1038. Here, the Court says that the purpose to deprive another of his right to trial by jury is "plain" from the wrongful conduct that in fact causes such a deprivation. Such intentionally wrongful conduct, because it contravenes a right definitely established in law, evidences a reckless disregard for that right; such reckless disregard, in turn, is the legal equivalent of willfulness.
 
 
 51
 The Court's decisions since Screws are to the same effect. Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951), involved special police officers who used "brutal methods" to extract confessions from individuals suspected of a series of thefts. Id. at 98, 71 S.Ct. at 578. The Court stated that such acts served to deprive these individuals of "fundamental, basic, and well-established constitutional rights," namely, the right to trial by jury and the right to refuse to testify against oneself. Id. at 101-02, 71 S.Ct. at 579. The Court had no difficulty concluding that the officers' conduct evidenced a specific intent to interfere with the suspects' rights: the officers "acted willfully and purposely; their aim was precisely to deny the protection the Constitution affords." Id. at 102, 71 S.Ct. at 579.
 
 
 52
 United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), reinstated an indictment charging defendants with a conspiracy whose object was to intimidate blacks in the exercise of their right of interstate travel. The Court observed that a conspiracy to rob an interstate traveler does not necessarily violate section 241. For this, the specific intent to interfere with the right in question must be shown. Proof is thus required that "the predominant purpose of the conspiracy is to impede or prevent the exercise of the right to interstate travel, or to oppress a person because of his exercise of that right...." Id. at 760, 86 S.Ct. at 1179.
 
 
 53
 Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), also involved a prosecution for conspiracy under 18 U.S.C. Sec. 241. The conspirators had cast fraudulent votes in a primary election to select candidates for local, state, and federal office. They argued, however, that their real objective was to secure the nomination of a particular candidate for county commissioner, a local office. They maintained that since their purpose was to influence the outcome of a local election, rather than a federal election, they could not be found guilty of acting with a specific intent to interfere with federal voting rights.
 
 
 54
 The Court affirmed the convictions. The evidence demonstrated that "each of the petitioners engaged in the conspiracy with the intent of having false votes cast for the federal officers." Id. at 224, 94 S.Ct. at 2262. This amounted to a willful deprivation of federal rights within the meaning of Screws: "The specific intent required under Sec. 241 is ... the intent to have false votes cast and thereby to injure the rights of all voters in a federal election...." Id. That the conspirators were not animated by a desire to injure voters in the exercise of their federal voting rights was "irrelevant." Id. at 226, 94 S.Ct. at 2263. "Every voter in a federal primary election ... has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes. And whatever their motive, those who conspire to cast false votes in an election for federal office conspire to injure that right within the meaning of Sec. 241." Id. at 227, 94 S.Ct. at 2263-64 (emphasis supplied). See Screws, 325 U.S. at 106, 65 S.Ct. at 1037 ("he who alters ballots or without legal justification destroys them would be acting willfully" to deprive people of their right to vote under Article I of the Constitution).
 
 
 55
 In all of these cases, the Court indicates that if a constitutional right is clearly delineated and the defendant acted "with the particular purpose of depriving the citizen victim of his enjoyment of the interests" that right protects, "he will be adjudged as a matter of law to have acted 'willfully'--i.e., 'in reckless disregard of constitutional prohibitions or guarantees.' " United States v. Ehrlichman, 546 F.2d 910, 921 (D.C.Cir.1976), cert. denied, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977). Armed with this understanding, we turn to appellants' particular contentions on appeal.
 
 III
 
 56
 Appellants mount three different challenges to the district court's jury instructions on the counts alleging deprivation of the right to be free from the use of excessive force during arrest. First, appellants claim that the district court erred in relying on the Supreme Court's decision in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), in defining the substantive right at issue. Second, appellants contend that the court's instructions were erroneous because they failed to tell the jury that it must find that appellants used excessive force "with knowledge that such force was unlawful," and with "the particular purpose to abuse official power for a governmental objective." Finally, appellants argue that the instructions were misleading because, "taken as a whole and viewed in the light of the evidence, [they] informed the jury that they could find appellant[s] guilty merely upon finding that [they] used objectively unreasonable force," effectively eliminating the specific intent requirement altogether.
 
 
 57
 * Whether a jury instruction correctly sets forth the elements of a statutory crime is a question of law reviewed de novo. United States v. Johnson, 956 F.2d 197, 199 (9th Cir.1992). The district court's formulation of these elements for the jury is reviewed for abuse of discretion. Id. An abuse of discretion in this context occurs where the jury instructions taken as a whole are misleading or inadequate to guide the jury's deliberations. United States v. Joetzki, 952 F.2d 1090, 1094 (9th Cir.1991).
 
 
 58
 An apparent intra-circuit split of authority confounds the standard of review this court applies to a district court's denial of a defendant's proposed jury instruction. See United States v. Frank, 956 F.2d 872, 878 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 363, 121 L.Ed.2d 276 (1992); but see United States v. Gomez-Osorio, 957 F.2d 636, 642 (9th Cir.1992) (suggesting that there is no true conflict in our decisions, and that "the question turns on the issue for review"). The apparent conflict is of no relevance here. In this instance, the district court refused appellants' proffered instructions on the ground that those instructions were contrary to law. Accordingly, we apply a de novo standard of review.
 
 B
 
 59
 Appellants argue that the district court erred insofar as it relied on the Supreme Court's decision in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), in formulating instructions on the right to be free of excessive force.[18] In Graham, the Court held that "all claims that law enforcement officers have used excessive force ... in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment...." Id. at 395, 109 S.Ct. at 1871. In so holding, the Court expressly disapproved "indiscriminate" application of the four-part test established by Judge Friendly in Johnson v. Glick, 481 F.2d 1028 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), to cases involving claims of excessive force. Judge Friendly had located a general right to be free of such force in the guarantee of substantive due process, and had articulated a test requiring proof that force was applied "maliciously or sadistically for the very purpose of causing harm" rather than in "a good faith effort to maintain or restore order" to make out a constitutional violation. Id. at 1033. By contrast, Graham's Fourth Amendment test is wholly objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham, 490 U.S. at 397, 109 S.Ct. at 1872 (citations omitted).
 
 
 60
 We have acknowledged the implications of the Graham decision in unambiguous terms. See Ward v. City of San Jose, 967 F.2d 280, 285 (9th Cir.1992) ("It is reversible error to give a substantive due process instruction in an excessive force case after Graham."); Reed v. Hoy, 909 F.2d 324, 329 (9th Cir.1989) ("under Graham, excessive force claims arising before or during arrest are to be analyzed exclusively under the fourth amendment's reasonableness standard"), cert. denied, --- U.S. ----, 111 S.Ct. 2887, 115 L.Ed.2d 1053 (1991). The district court was thus entirely correct to apply Graham in instructing the jury as to the constitutional right alleged to have been violated by appellants' use of excessive force.
 
 
 61
 Appellants nonetheless argue that the district court's reliance on Graham was erroneous. In general, they suggest that, because Graham was a civil case arising under 42 U.S.C. Sec. 1983, it is somehow an inappropriate model in the context of a criminal prosecution under section 242. More particularly, they suggest that because whether an officer acted willfully is excluded from consideration under Graham's objective Fourth Amendment test, that case cannot be used to analyze the crime defined by the statute, of which willfulness is an element.
 
 
 62
 These arguments betray confusion regarding the structure of section 242. Appellants fail to grasp that the violation of a federally protected right and the specific intent to violate that right are separate elements of the crime established by the statute.[19] The threshold question here, then, is whether appellants violated the constitutional rights of individuals they detained or arrested. If they did so, the next question would be whether they acted with the specific intent to violate those rights. These two questions are logically, and legally, independent.
 
 
 63
 There is thus nothing wrong with looking to a civil case brought under 42 U.S.C. Sec. 1983 for guidance as to the nature of the constitutional right whose alleged violation has been made the basis of a section 242 charge. The protections of the Constitution do not change according to the procedural context in which they are enforced--whether the allegation that constitutional rights have been transgressed is raised in a civil action or in a criminal prosecution, they are the same constitutional rights.[20] Thus, the Supreme Court's explanation of the right to be free from excessive force during arrest does not somehow lack authority here merely because it was set forth in a section 1983 case. See United States v. Schatzle, 901 F.2d 252, 254-55 (2d Cir.1990) (applying Graham in reviewing jury instruction in Sec. 242 prosecution alleging deprivation of constitutional rights by the use of excessive force).[21]
 
 
 64
 These considerations explain why the district court committed no error in rejecting appellants' proposed jury instructions. The instructions requested were drawn from excessive force cases that are simply irrelevant in light of Graham. In each of these cases, the rights alleged to have been infringed by excessive force were due process rights. Since Graham establishes that the use of excessive force during detention or arrest is to be analyzed under the Fourth Amendment, the instructions given in the cited cases offer no guidance. See Caballero v. Concord, 956 F.2d 204, 206 (9th Cir.1992) ("due process cases have little relevance to a 1983 action involving fourth amendment rights") (citation and internal punctuation omitted).
 
 
 65
 For example, appellees cite United States v. Cobb, 905 F.2d 784, 788 (4th Cir.1990), cert. denied, 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991), in support of their request for an instruction phrased in terms of "whether force was applied ... maliciously and sadistically for the very purpose of causing harm." Id. at 788. But in Cobb, the victim of the defendant's excessive force was a pretrial detainee rather than an arrestee. The Fourth Circuit held that the rights at issue were thus substantive due process rights, see Graham, 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10, and approved the above instruction because it tracks Judge Friendly's Johnson test, which the court deemed applicable under the circumstances. See Cobb, 905 F.2d at 788-89. Cobb is therefore inapposite, and the requested instruction has no place here, where the constitutional violation alleged is, says Graham, a Fourth Amendment violation.
 
 
 66
 Similarly, appellants' request for an instruction requiring the jury to find that "force was used with the intention of inflicting summary punishment or otherwise depriving an individual of due process of law" was also properly denied. Even on its face it is evident that this instruction applies to cases implicating due process rights rather than Fourth Amendment rights. The cases cited in support of the instruction are, likewise, due process cases, and of no relevance in this context. See United States v. Messerlian, 832 F.2d 778, 791 (3d Cir.1987), cert. denied, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988); United States v. Delerme, 457 F.2d 156, 157 (3d Cir.1972).
 
 
 67
 The district court properly instructed the jury on the right to be free from excessive force during arrest.
 
 C
 
 68
 We turn now to the district court's instructions on specific intent. The court charged the jury that to be convicted under section 242, "a defendant must have acted willfully. I instruct you that an act is done willfully if it is done voluntarily and intentionally and with a specific intent to do something the law forbids, that is, with the intent to violate a specific protected right." This is an accurate statement of the law as set forth in Screws.
 
 
 69
 The court further instructed the jury that "[f]or the eight counts in which various defendants are charged with intentionally using unreasonable force, the requisite specific intent is the intent to use more force than is necessary under the circumstances." This instruction is also quite correct. The critical point here is that a mere intention to use force that the jury ultimately finds unreasonable--that is, general criminal intent--is insufficient for conviction under section 242. This instruction indicates that the jury was required to find that appellants intended to use unreasonable force--that is, that they intended not only the force, but its unreasonableness, its character as "more than necessary under the circumstances." This is precisely the specific intent required by Screws as applied to violations of the right to be free of unreasonable seizures of the person under the Fourth Amendment.
 
 
 70
 Appellants nonetheless contend that these instructions were erroneous because they omitted necessary elements of the concept of specific intent as defined by Screws and its progeny. First, appellants suggest that the district court erred in failing to instruct the jury that it could convict on the excessive force counts only if it found that appellants knew their use of force was unlawful. The district court's instruction, of course, informed the jury that it need find only that appellants knew their use of force was excessive: "the requisite specific intent is the intent to use more force than is necessary under the circumstances." According to appellants, the district court compounded its error of omission by instructing the jury that "it is not necessary for you to find that the defendants were thinking in constitutional or legal terms at the time of the incidents, because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights" (emphasis supplied). Appellants suggest that the emphasized language is contrary to Screws, which, they maintain, teaches that "reckless disregard of a constitutional right occurs only when a person knowingly acts unlawfully."
 
 
 71
 Appellants are incorrect. As our analysis in Part II above makes clear, Screws says nothing whatsoever about whether the defendant officers knew that they acted outside the boundaries of state law when they beat their prisoner to death; such knowledge or lack thereof was irrelevant to the Court's analysis of specific intent. The same observation applies to the Court's decisions in Williams, Guest, and Anderson. The point of all these cases is that the defendant need not have been thinking about the law to have acted in reckless disregard of federal rights.
 
 
 72
 Moreover, the weight of authority among the courts of appeals supports the view that "[t]here is no requirement under section 241 [or 242] that a defendant recognize the unlawfulness of his acts." Ehrlichman, 546 F.2d at 922. See Apodaca v. United States, 188 F.2d 932, 937 (10th Cir.1951) (approving instruction that specific intent "does not require knowledge that [one's] act is a violation of law"); see also United States v. Cobb, 905 F.2d 784, 788 (4th Cir.1990); United States v. Gwaltney, 790 F.2d 1378, 1386 (9th Cir.1986), cert. denied, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987); United States v. Garza, 754 F.2d 1202, 1210 (5th Cir.1985); United States v. Dean, 722 F.2d 92, 94 (5th Cir.1983); United States v. Harrison, 671 F.2d 1159, 1162 (8th Cir.), cert. denied, 459 U.S. 847, 103 S.Ct. 104, 74 L.Ed.2d 94 (1982); United States v. McClean, 528 F.2d 1250, 1255 (2d Cir.1976); United States v. Stokes, 506 F.2d 771, 776 (5th Cir.1975); United States v. O'Dell, 462 F.2d 224, 232 n. 10 (6th Cir.1972); United States v. Ramey, 336 F.2d 512, 515 (4th Cir.1964), cert. denied, 379 U.S. 972, 85 S.Ct. 649, 13 L.Ed.2d 564 (1965); Pullen v. United States, 164 F.2d 756, 758-59 (5th Cir.1947). In short, the district court did not err in failing to instruct the jury that appellants could not be convicted unless they "knowingly acted unlawfully."
 
 
 73
 The second alleged error of omission in the district court's specific intent instructions points to the court's failure to instruct that "the defendant must harbor the particular purpose that his conduct accomplish a governmental objective such as punishment or a 'trial by ordeal' " before a conviction under section 242 may be returned. As we understand it, this contention conflates two different ideas that have been discussed in the reported cases in connection with the concept of specific intent, and presents them as separate legal requirements thereof.
 
 
 74
 On the one hand, appellants argue that the court should have included in its instructions "a purpose to abuse governmental authority ... beyond the specific intent" to violate a constitutional right. Appellants claim to discern in each of the Supreme Court's cases in this area some such particular governmental purpose: in Screws, a purpose to subject another to trial by ordeal rather than by jury; in Williams, a purpose to impose summary punishment; in Guest, a purpose to impede interstate travel; in Anderson, a purpose to interfere with the right to vote. Yet in none of these cases was the "purpose" so characterized anything "beyond" the specific intent necessary for conviction under sections 241 and 242. Rather, in each case, the purpose was the specific intent necessary for conviction. The "purposes" to which appellants point in these cases are merely descriptive of the due process rights alleged to have been infringed in each. For example, in Screws the Court described the specific intent requirement in terms of a purpose to subject another to "trial by ordeal" for the simple reason that the alleged constitutional violation was the "deprivation ... of the trial which due process guarantees...." 325 U.S. at 106, 65 S.Ct. at 1038. Since this case involves deprivations of the right to be free from unreasonable force during detention and arrest, the district court correctly instructed the jury on the only "purpose" that was relevant to its deliberations: appellants' alleged purpose to subject others to unreasonable force during detention and arrest. No "additional" purpose could properly have been required.
 
 
 75
 On the other hand, appellants argue that the court should have required the jury to distinguish "between an act done for a purely personal, nongovernmental reason and that act done for an ostensible government reason." The court, they argue, in failing to do so transformed appellants' "personal act[s] of misconduct into ... violation[s] of Sec. 242."
 
 
 76
 But it is clear that appellants do not here identify an aspect of specific intent--they describe, rather, the requirement that acts punishable under section 242 be carried out "under color of law." This case involves illegal conduct by law enforcement officers during the detention and arrest of criminal suspects, conduct that unquestionably took place under color of law. Even if they were animated by "purely personal reasons," appellants would not be immunized from criminal liability under section 242. Conduct that is so motivated may nevertheless be conduct "under color of law," and thus may result in a conviction under the statute. See United States v. Tarpley, 945 F.2d 806, 809 (5th Cir.1991) (affirming conviction of deputy sheriff under Sec. 242 for beating his wife's former lover: Screws does not mean that an official acting "for purely personal reasons" does not act under color of law), cert. denied, --- U.S. ----, 112 S.Ct. 1960, 118 L.Ed.2d 562 (1992). Appellants' contention that they acted "for purely personal reasons" is thus quite beside the point.
 
 
 77
 The district court's instructions on specific intent were not erroneous.
 
 D
 
 78
 Appellants next contend that, taken as a whole, the district court's instructions on excessive force were misleading in that they permitted the jury to convict merely upon a finding that they used objectively unreasonable force, without regard to the intent with which they acted.
 
 
 79
 Appellants acknowledge that the jury was told that it must find that they intended to use more force than was necessary to effect the arrests in question. They point out, however, that the jury was then told to judge how much force was necessary from the point of view of a "reasonable" officer on the scene. Appellants argue that the juxtaposition of these two instructions was misleading. Specifically, they assert that the jury may have confused the subjective and objective components of the inquiry required by the district court, and so believed that the crime charged "boiled down" to whether objectively unreasonable force was employed. They contend that the court's instructions effectively did away with the need for a finding as to their specific intent, indeed, for any finding as to mens rea.
 
 
 80
 This argument has a certain superficial plausibility when the court's instructions are redacted as they are in appellants' briefs. When the relevant portions of those instructions are read in their entirety, however, it is plain that appellants' position is without merit. The district court announced as separate elements of the crime charged (1) the requirement that a constitutional violation be proved and (2) the requirement that a specific intent to commit such a violation be proved. The fact that five separate examples of specific intent were then listed by the court could not have failed to impress upon the jury that specific intent is a distinct element of a section 242 violation. That appellants in their briefs refuse to distinguish clearly between the violation of a constitutional right and the specific intent to violate that right does not mean that the jury had any difficulty following the district court's instructions, which set forth that distinction unmistakably.
 
 
 81
 The jury instructions were adequate to guide the jury and were not misleading.
 
 IV
 
 82
 In addition to his conviction for conspiracy under count one of the indictment, Sergeant Broussard was convicted on counts three and seven, each of which charged that he willfully permitted Task Force members under his supervision to use excessive force against individuals they were arresting, and took no steps to stop the assaults, thereby depriving these individuals of their constitutional right to be kept free from harm while in official custody or detention. On appeal, as he did at trial, Broussard argues that there was no legal basis for these convictions, because his failure to act did not "subject" these individuals to the deprivation of a right "secured or protected by the Constitution" within the meaning of section 242. He also contends that the evidence was insufficient to convict as to count seven.
 
 
 83
 * Broussard contends that he had no legal obligation to act to prevent the assaults on Dailey and Verduzco. Stated differently, Broussard argues that there is no constitutional right to protection from such assaults, and that the district court erred in failing to dismiss counts three and seven of the indictment. We disagree.
 
 
 84
 The Supreme Court has explained that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety.... [An] affirmative duty to protect arises ... from the limitation which [the state] has imposed on his freedom to act on his own behalf." DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989). Indeed, the Court recognized over one hundred years ago that persons in the custody or control of law enforcement officers have a right to be protected from "lawless violence."
 
 
 85
 The prisoners were in the exclusive custody and control of the United States, under the protection of the United States, and in the peace of the United States. There was a co-extensive duty on the part of the United States to protect against lawless violence persons so within their custody, control, protection and peace; and a corresponding right of those persons, secured by the Constitution and laws of the United States, to be so protected by the United States.
 
 
 86
 Logan v. United States, 144 U.S. 263, 285, 12 S.Ct. 617, 623, 36 L.Ed. 429 (1892). More than one law enforcement officer has been convicted of a federal criminal offense for transgressing this right. See Lynch v. United States, 189 F.2d 476, 479 (5th Cir.) (recognizing "the right of protection due the prisoner by the arresting officers" against harm from other officers and third parties alike), cert. denied, 342 U.S. 831, 72 S.Ct. 50, 96 L.Ed. 629 (1951); Catlette v. United States, 132 F.2d 902 (4th Cir.1943) (holding that "the failure of Catlette to protect the victims from group violence" after they were taken into custody "comes squarely within the provisions of" the predecessor to Sec. 242).[22] In our own cases, meanwhile, we have similarly recognized that an individual constitutional right to protection may arise under certain narrowly defined circumstances, that is, when the state assumes a "special relationship" with a particular person by taking him into its custody, or when the state affirmatively creates the danger to which a person is exposed. See L.W. v. Grubbs, 974 F.2d 119, 121 (9th Cir.1992); Wood v. Ostrander, 879 F.2d 583 (9th Cir.1989), cert. denied, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990).[23]
 
 
 87
 In sum, principles approved by the Supreme Court, recognized in previous section 242 prosecutions, and acknowledged in our own decisions compel the conclusion that Dailey and Verduzco enjoyed a constitutional right to be protected against the assaults perpetrated by Reese and Houston.
 
 B
 
 88
 Broussard argues that, even if a right to such protection must be held to exist, no such right had been "made definite by decision or other rule of law" in 1989, when these assaults occurred. Screws, 325 U.S. at 103, 65 S.Ct. at 1036. This argument plainly cannot stand in the face of the authorities cited above. Indeed, to these we might add numerous decisions of our sister circuits, which uniformly recognize the right here at issue.[24] It is true that all of these cases were civil actions under 42 U.S.C. Sec. 1983, but, again, that is simply not relevant. Under Screws, it is the right at issue that must be "made definite by decision or other rule of law," not the fact that the willful abrogation of that right may result in a criminal conviction.[25]
 
 C
 
 89
 Broussard also argues that liability under section 242 may not be predicated on a mere failure to act. This argument has little to recommend it. In terms, the statute extends to "the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 18 U.S.C. Sec. 242 (emphasis supplied). In discussing the analogous language of section 241, the Supreme Court in United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), had this to say:
 
 
 90
 The language of Sec. 241 is plain and unlimited. [It] embraces all of the rights and privileges secured to citizens by all of the Constitution and all of the laws of the United States.
 
 
 91
 * * * * * *
 
 
 92
 We think [its] history leaves no doubt that, if we are to give Sec. 241 the scope its origins dictate, we must accord it a sweep as broad as its language. We are not at liberty to seek ingenious analytical instruments for excluding from its general language the Due Process Clause of the Fourteenth Amendment
 
 
 93
 ....
 
 
 94
 Id. at 800-01, 86 S.Ct. at 1160. The Court noted that, although section 242 in its original form was narrower in scope than section 241, "[t]he section was then broadened to include as wide a range of rights as Sec. 241 already did." Id. at 803, 86 S.Ct. at 1161. Accordingly, this court is "not at liberty" to exclude willful deprivations of the right to be protected from harm at the hands of law enforcement officers from the ambit of the federal criminal law. See United States v. Langer, 958 F.2d 522, 524 (2d Cir.1992) ("The Supreme Court has made it perfectly clear that 'once a due process right has been defined and made specific by court decisions, that right is encompassed by Sec. 242.' ") (quoting United States v. Stokes, 506 F.2d 771, 774-75 (5th Cir.1975)).
 
 
 95
 Against this authority, Broussard cites only one case, United States v. Hunter, 214 F.2d 356 (5th Cir.), cert. denied, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 698 (1954). The citation is unhelpful. In Hunter, a Florida state attorney was indicted for failing to apply to the trial court for the release of a prisoner who had been detained as a material witness after the indictment against him was dismissed. The Fifth Circuit affirmed the dismissal of the charges against Hunter, holding that the law did not impose a duty on a prosecutor to apply for the release of a prisoner, so that the failure to make such application could not have violated the prisoner's federal rights.
 
 
 96
 The court then added a footnote in which it suggested that the language of section 242, imposing criminal liability on one who "willfully subjects" another to the deprivation of his federal rights, "implies some type of affirmative action upon the part of the officer." Id. at 358 n. 3. This statement is plainly dictum, and, in light of the reasoning that underlies it, it is not persuasive here. Simply stated, it is clear to us that a police sergeant who stands by and watches while officers under his command use excessive force and refuses to order them to stop may thereby "subject" the victim to the loss of his or her right to be kept free from harm while in official custody or detention.
 
 D
 
 97
 Finally, Broussard argues that as to count seven of the indictment, involving the episode in which Houston struck Verduzco in the head with his flashlight, the evidence was insufficient to convict.[26] He contends that the assault consisted essentially of a single blow, which he could not have anticipated let alone prevented, and thus that no rational jury could have found beyond a reasonable doubt that he had willfully failed to intervene.
 
 
 98
 We must, however, consider the evidence introduced at trial in the light most favorable to the government. So viewed, we think the jury could reasonably have found that the assault developed over a period of time, and consisted of more than merely a single, sudden blow. Verduzco testified that Houston grabbed her hair and pulled her head back repeatedly, then shoved her toward her car before hitting her with the flashlight. The testimony of three different witnesses indicated that Broussard was standing somewhere between five and ten feet from Houston during this episode. Officer Garden testified that Broussard was "[j]ust standing there" watching Houston and Verduzco, and neither said anything to Houston, nor attempted to intervene in any way, although he could have done so. Broussard, meanwhile, testified that he was not in the immediate vicinity of the assault and did not see Houston strike Verduzco. The determination of which version of the events in question was more worthy of belief was exclusively for the jury.
 
 
 99
 On the basis of this testimony, the jury could reasonably have concluded that Broussard recognized that Houston was using or imminently would use excessive force, and that there were reasonable steps within his power that he could have taken to prevent this use of force, but that he deliberately chose not to act, thus making out the elements required for conviction. We hold that the evidence was sufficient to support the jury's verdict on count seven.
 
 E
 
 100
 To punish a defendant simply because of his relationship to guilty parties is the height of injustice. The risk of such injustice is especially pronounced in the kind of situation with which we are confronted here. We thus think it important to state that Broussard has not been held vicariously liable for the constitutional violations committed by others. His is not guilt by association. Nor is he to be punished merely for being the supervisor of men who acted unlawfully. Instead, Broussard's convictions rest entirely on the wrongfulness of his own conduct in connection with the attacks by Reese and Houston on Dailey and Verduzco, that is, his willful refusal to act in the face of the ongoing assaults perpetrated in his presence. He could have and should have acted. He chose not to.
 
 
 101
 Broussard's convictions on counts three and seven of the indictment are affirmed.
 
 V
 
 102
 Appellants contend that the district court's jury instructions on the excessive force counts constructively amended the indictment under which they were tried, requiring reversal of their convictions. This allegation presents a legal question to be reviewed de novo. United States v. Pisello, 877 F.2d 762, 764 (9th Cir.1989). Since the issue was not raised below, however, only plain error will suffice to justify reversal.
 
 
 103
 The indictment charged appellants with violating certain individuals' rights not to be deprived of liberty without due process of law, "which includes the right to be secure in their persons, that is, the right to be free from the intentional use of unreasonable force by one acting under color of law." Appellants claim that this language charges a violation of the substantive due process rights of arrestees under the Fourteenth Amendment, and that the district court constructively amended the indictment when it instructed the jury on the right at issue under the Fourth Amendment standard.
 
 
 104
 The government maintains that the language of the indictment clearly alleges a violation of the Fourth Amendment right to be free from unreasonable seizures, as made applicable to the states through the Due Process Clause of the Fourteenth Amendment. The government points out that the terms in which the relevant right is described are precisely those used in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Appellants rejoin that the indictment nowhere mentions the word "seizure" as it should have done if it was indeed Fourth Amendment rights that were alleged to be at issue.
 
 
 105
 We think the language of the indictment is at least as amenable to the government's construction as to that of the appellants. Indeed, since we have held that "[i]t is reversible error to give a substantive due process instruction in an excessive force case after Graham," Ward v. San Jose, 967 F.2d 280, 285 (9th Cir.1991), it would have been most unreasonable for the district court to read the indictment otherwise than it did.
 
 
 106
 More important, this court has held that "a constructive amendment occurs when the crime charged [is] substantially changed at trial, so that it [is] impossible to know whether the grand jury would have indicted for the crime actually proved." Pisello, 877 F.2d at 765 (quoting United States v. Van Stoll, 726 F.2d 584, 586 (9th Cir.1984)). We have observed that those cases in which a constructive amendment has been found have "dealt with verdicts resting on proof so different from the proof accepted by the indicting grand jury that substantial rights of the defendant were affected." Id. at 766.
 
 
 107
 Appellants' argument clearly fails under this standard. It cannot seriously be maintained that, while the grand jury in fact indicted appellants for the crime of willfully applying excessive force in violation of the Due Process Clause, it would not have returned an indictment for the crime of willfully applying excessive force in violation of the Fourth Amendment. The proof placed before the grand and petit juries was exactly the same.[27]
 
 
 108
 The district court's instructions did not amount to a constructive amendment of the indictment.
 
 VI
 
 109
 Appellants next contend that the district court should have granted their motions for severance under Federal Rule of Criminal Procedure 14 after Dwyer filed a declaration stating that he would be willing to testify on their behalf, but only at a separate trial.
 
 
 110
 In general, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.... [T]he determination of risk of prejudice and any remedy that may be necessary [is left] to the sound discretion of the district courts." Zafiro v. United States, --- U.S. ----, ----, ----, 113 S.Ct. 933, 938, 939, 122 L.Ed.2d 317 (1993). The record shows that the district court carefully weighed appellants' allegations that they would be prejudiced by a joint trial before concluding that the risk of prejudice was not serious enough to warrant separate trials. We believe the court acted properly.
 
 
 111
 "When the reason for severance is the need for a codefendant's testimony," the threshold showing required of the defendant is "(1) that he would call the defendant at a severed trial, (2) that the codefendant would in fact testify, and (3) that the testimony would be favorable to the moving party." United States v. Hernandez, 952 F.2d 1110, 1115 (9th Cir.), (citations and internal punctuation omitted), cert. denied, --- U.S. ----, 113 S.Ct. 334, 121 L.Ed.2d 252 (1992). However, even if this threshold is crossed, a defendant will not necessarily be entitled to a reversal of his conviction. Rather, we have held that, because of "the extremely narrow scope of [appellate] review, ... a moving defendant must show ... that the codefendant's testimony is 'substantially exculpatory' in order to succeed." United States v. Mariscal, 939 F.2d 884, 886 (9th Cir.1991).
 
 
 112
 Appellants maintain that "this is the rare case [that] meets this stringent test." They argue that Dwyer's testimony would have been substantially exculpatory, especially since Dwyer would have corroborated Broussard's testimony (that no conspiracy existed, etc.), and would have refuted the testimony of Garden, Dwyer's onetime partner who testified for the government pursuant to a plea arrangement. In addition, they emphasize that the concern for judicial economy, ordinarily an important factor militating against severance, here carried no weight whatsoever, because the district court had already granted a motion for severance as to two other codefendants.
 
 
 113
 We do not believe that Dwyer's testimony can properly be characterized as "substantially exculpatory" as to any of the appellants. In Mariscal, we held that testimony is not substantially exculpatory if it "would merely contradict portions of the government's proof ... leaving other inculpatory evidence that in and of itself would be sufficient to support a conviction...." Id. Dwyer's proffered testimony essentially consisted of a series of denials that the testimony of certain government witnesses was true. We are satisfied that, ignoring that portion of the testimony Dwyer said he would contradict, there yet remained ample evidence to support the jury's verdicts on each of the counts on which they voted to convict Reese, Houston, and Broussard.
 
 
 114
 In sum, there was no "serious risk that [the] joint trial ... compromise[d] a specific trial right of one of the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence." Zafiro, --- U.S. at ----, 113 S.Ct. at 938. The district court therefore did not abuse its discretion in denying severance.
 
 VII
 
 115
 Appellants challenge three rulings by the district court that restricted their ability to cross-examine government witnesses about their history of involvement with drugs. This court reviews such rulings for abuse of discretion, "considering whether the jury is otherwise in possession of sufficient information upon which to make a discriminating appraisal of the subject matter at issue." United States v. Brown, 936 F.2d 1042, 1049 (9th Cir.1991) (citation and internal punctuation omitted). Moreover, two of the three rulings are challenged on appeal on grounds not raised in the district court, and are therefore reviewed only for plain error. United States v. Lopez-Cavasos, 915 F.2d 474, 475-76 (9th Cir.1990); United States v. Gomez-Norena, 908 F.2d 497, 500 (9th Cir.), cert. denied, 498 U.S. 947, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990).
 
 
 116
 Although appellants construct elaborate theories to explain why the testimony they sought to elicit was relevant and important, we believe that it was neither. At bottom, appellants sought simply to discredit these witnesses in the eyes of the jury with evidence of their past drug involvements, which were totally unrelated to the events to which they testified. "The sixth amendment right to cross-examine adverse witnesses does not empower a defendant to pursue irrelevant inquiries...." Brown, 936 F.2d at 1048. The district court therefore did not abuse its discretion in thus limiting the scope of cross-examination.VIII
 
 
 117
 Appellants contend that the evidence was insufficient to support their convictions on the conspiracy count, as well as on a number of the substantive counts.
 
 
 118
 As to the former, we are mindful of our obligation to "scrutinize the record ... with special care in a conspiracy case" under section 241. United States v. Anderson, 417 U.S. 211, 224, 94 S.Ct. 2253, 2262, 41 L.Ed.2d 20 (1974). Moreover, we recognize that there was no direct proof of an express agreement on the part of appellants to commit the constitutional violations here at issue. Nonetheless, we have no difficulty concluding that the jury had ample evidence from which to find that appellants had conspired with the specific intent of injuring others in the exercise of their constitutional rights, as charged. See United States v. Davis, 810 F.2d 474 (5th Cir.1987).
 
 
 119
 Similarly, we have carefully reviewed appellants' contentions with respect to each of the substantive convictions challenged on sufficiency of the evidence grounds. We believe, however, that the verdicts are adequately supported in each instance. We therefore affirm appellants' convictions.
 
 IX
 
 120
 * Appellants Reese, Dwyer, and Broussard appeal their sentences under the Sentencing Guidelines.[28] The district court's interpretation of the Guidelines is reviewed de novo. United States v. Blaize, 959 F.2d 850, 851 (9th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2954, 119 L.Ed.2d 576 (1992). Factual findings in the sentencing phase are reviewed for clear error. United States v. Chapnick, 963 F.2d 224, 226 (9th Cir.1992). References to the Guidelines are to the version that became effective November 1, 1989, unless otherwise noted.
 
 B
 
 121
 Appellants contend that the district court erred in its application of Guidelines section 3D1.2(b)(1), pursuant to which each substantive count was treated as a separate object of the conspiracy, and grouped with a conspiracy count for purposes of sentencing.
 
 
 122
 Appellants point out that the jury's verdict did not establish which offense(s) had been found as the object of the conspiracy. In such circumstances, Application Note 9 of section 3D1.2[29] indicates that the district court should group each substantive offense with a conspiracy count only "if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense." Appellants claim that, because the district court did not expressly state that it would have found defendants guilty beyond a reasonable doubt of conspiring with respect to each substantive offense, it was error to employ the grouping procedure.
 
 
 123
 It is late in the day for appellants to be complaining of this error. The various groupings were set forth in the presentence reports ("PSRs"), and no objections thereto were filed. The district court adopted the groupings proposed in the PSRs, and no appellant asked for a specific finding from the court. Since the issue was not raised below, only plain error will suffice to justify reversal.
 
 
 124
 We see no reason to require an express finding from the district court under the circumstances, that is, in the absence of an objection to the PSRs or at sentencing. The Application Note itself says merely that the grouping procedure "should only be applied ... if the court ... would convict the defendant of conspiring to commit that object offense." This does not suggest that a finding to this effect must be placed on the record before grouping may proceed; the Guidelines merely direct the court to satisfy itself on the point.
 
 
 125
 In any event, the government argues persuasively that the district court implicitly made the findings appellants seek to require, since otherwise the court would not have adopted the PSRs' recommendations. See United States v. Rosales, 917 F.2d 1220, 1222 (9th Cir.1990) (district court satisfies requirement that all disputed matters be resolved on the record by adopting conclusions in PSR). Appellants, meanwhile, having failed to raise the matter in timely fashion, now simply speculate that the district court may not have read the Application Note, or may have failed to understand what it required of the court. We will not indulge such speculation.[30]
 
 C
 
 126
 We turn next to appellants' allegations that the district court engaged in impermissible double counting in computing their sentences.
 
 
 127
 Under the Guidelines, the base offense level applicable to a conviction for the deprivation of civil rights is determined by reference to the offense level of the substantive offense the defendant's conduct most nearly resembles. See U.S.S.G. Sec. 2H1.4. In this case, the district court looked to the aggravated assault guideline in sentencing on several of the excessive force counts. See U.S.S.G. Sec. 2A2.2. Appellants argue that the court erred in its application of this guideline.
 
 
 128
 An assault is "aggravated" and comes within the purview of section 2A2.2 when it involves "(a) a dangerous weapon with intent to do bodily harm ..., or (b) serious bodily injury, or (c) an intent to commit another felony." U.S.S.G. Sec. 2A2.2 at Application Note 1. In addition, sections 2A2.2(b)(2) and (3) make the use of a weapon and the infliction of bodily injury specific offense characteristics of aggravated assault, mandating a series of offense level increases for such conduct.[31] Appellants argue that the district court erred in applying these adjustments in computing their sentences, because the court had already taken the same conduct into account in determining that the guideline for aggravated rather than minor assault should apply. See U.S.S.G. Sec. 2A2.3. The court, say appellants, used the same factor twice, first to "increase" their base offense level, then as specific offense characteristics to increase that offense level, and was thus guilty of impermissible double counting.
 
 
 129
 At the outset, we observe that on its face this Guidelines section clearly requires the "double counting" of which appellants complain here. See United States v. Newman, 982 F.2d 665, 673 (1st Cir.1992) (noting that Sec. 2A2.2(b) "expressly mandate[s] the 'double counting' " of serious bodily injury in calculating offense level). This, coupled with the fact that "[t]he Sentencing Commission plainly understands the concept of double counting, and expressly forbids it where it is not intended," United States v. Williams, 954 F.2d 204, 208 (4th Cir.1992), persuades us that the result appellants seek to avoid is the result intended by the Commission. The question before us is whether such a result is permissible. We have no doubt that it is.
 
 
 130
 The Guidelines seek to punish a defendant for "all harm that resulted from the acts and omissions" for which he is responsible. U.S.S.G. Sec. 1B1.3(a)(3). When more than one kind of harm is attributable to a given aspect of a defendant's conduct, failure to enhance his punishment for each harm caused thereby would defeat the Commission's goal of proportionality in sentencing. Thus, there is nothing wrong with "double counting" when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct. See United States v. Starr, 971 F.2d 357, 361 (9th Cir.1992) ("multiple uses of a particular aspect of a defendant's past behavior are proper where each invocation of the particular behavior serves a unique purpose under the Guidelines"). See also United States v. Adeleke, 968 F.2d 1159, 1161 (11th Cir.1992) ("double counting" permissible where sections applied "concern[ ] conceptually separate notions relating to sentencing") (citations omitted); United States v. Campbell, 967 F.2d 20, 25 (2d Cir.1992) ("double counting is legitimate where a single act is relevant to two dimensions of the Guidelines analysis").
 
 
 131
 There is, of course, such a thing as impermissible double counting. It occurs where one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the Guidelines. In practical terms, this means that impermissible double counting is to be found where one Guidelines provision "is akin to a 'lesser included offense' of another," yet both are applied. United States v. Snider, 976 F.2d 1249, 1252 (9th Cir.1992).
 
 
 132
 Thus, the use of a single aspect of conduct both to determine the applicable offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it is impossible to come within that guideline. If, on the other hand, it is possible to be sentenced under a particular offense guideline without having engaged in a certain sort of behavior, such behavior may be used to enhance the offense level, for in this situation, the guideline's base offense level will not necessarily have been set to capture the full extent of the wrongfulness of such behavior. See United States v. Wright, 891 F.2d 209, 211 (9th Cir.1989) (under escape guideline (Sec. 2P1.1), adjustment for having committed crime while "under sentence" (Sec. 4A1.1) did not result in impermissible double counting because being "under sentence" is not a necessary element of offenses covered by this guideline--one may escape from pretrial custody). See also United States v. Long, 977 F.2d 1264, 1277 (8th Cir.1992) (under money laundering guideline (Sec. 2S1.1), increase for specific offense characteristic of having knowingly laundered drug money did not result in impermissible double counting because guideline applies "not just [to] the laundering of drug money, but [to] the laundering of any proceeds from a myriad of specified unlawful activities"); United States v. Lieberman, 971 F.2d 989, 992 (3d Cir.1992) (under embezzlement guideline (Sec. 2B1.1), adjustment for abuse of trust (Sec. 3B1.3) did not result in impermissible double counting because "abuse of position of trust is not included in the base offense level or specific offense characteristic applicable to bank embezzlement") (citation omitted); United States v. Doubet, 969 F.2d 341, 347 (7th Cir.1992) (under robbery guideline (Sec. 2B3.1), increase for specific offense characteristic of "physical restraint" did not result in impermissible double counting because "robbery does not necessarily entail physical restraint"); United States v. Hershkowitz, 968 F.2d 1503 (2d Cir.1992) (under civil rights violations guideline (Sec. 2H1.4), vulnerable victim enhancement (Sec. 3A1.1) did not result in impermissible double counting because not every violation of civil rights under color of law involves a victim who is "particularly susceptible to the criminal conduct"); United States v. Ellen, 961 F.2d 462, 468 (4th Cir.) (under environmental pollution guideline (Sec. 2Q1.3), increase for specific offense characteristic of "ongoing" discharge of a pollutant did not result in impermissible double counting because guideline "applies to offenses that do not involve the discharge of a pollutant"), cert. denied, --- U.S. ----, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992); United States v. Ransom, 942 F.2d 775, 778-79 (10th Cir.1991) (under abusive sexual contact guideline (Sec. 2A3.4), increase for specific offense characteristic applicable where victim is less than 12 years of age did not result in impermissible double counting because offenses sentenced under guideline include sexual abuse of any person who is "incapable of appraising the nature of the conduct"), cert. denied, --- U.S. ----, 112 S.Ct. 897, 116 L.Ed.2d 799 (1992).
 
 
 133
 Applying the rule set forth above to the case at hand, it is apparent that appellants' argument must fail. For, as noted, among the assaults deemed to be aggravated within the meaning of section 2A2.2 are those committed "with intent to commit another felony." U.S.S.G. Sec. 2A2.2 at Application Note 1. It is therefore obvious that conduct may come within the aggravated assault guideline that does not involve either the use of a dangerous weapon or serious bodily injury. It follows that no impermissible double counting occurs when either or both these factors are used to increase the base offense level applicable to this guideline. See United States v. Newman, 982 F.2d 665 (1st Cir.1992) (use of fact that defendant's victim suffered serious bodily injury both to trigger application of aggravated assault guideline and to enhance base offense level thereunder does not result in impermissible double counting); United States v. Williams, 954 F.2d 204 (4th Cir.1992) (same in context of use of dangerous weapon).[32]
 
 
 134
 For the same reasons, we reject appellants' contention that it was impermissible double counting to enhance the base offense level applicable to their conspiracy convictions on the grounds that they were public officials at the time of their offense. See U.S.S.G. Sec. 2H1.2. While it is true that the offense guideline here applies only to violations of 18 U.S.C. Sec. 241, it is also true that one need not be a public official in order to be convicted under that section. Private individuals can run afoul of section 241 by conspiring with police officers or other officials. See, e.g., United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Moreover, with respect to rights whose violation does not require "state action," a purely private conspiracy can suffice for liability under this statute. See, e.g., United States v. Skillman, 922 F.2d 1370, 1372 (9th Cir.1990) (racially motivated conspiracy to interfere with exercise of housing rights), cert. denied, --- U.S. ----, 112 S.Ct. 353, 116 L.Ed.2d 275 (1991). Thus, because being a public official is not a necessary element of the offense covered by section 2H1.2, there was no impermissible double counting in adjusting appellants' base levels in accordance with that section.
 
 D
 
 135
 Appellant Reese challenges the district court's decision to sentence him under the aggravated assault guideline for his conviction on count two, the use of excessive force against Dailey.
 
 
 136
 Reese argues that the court erred in ruling that Dailey's injury was "serious," thus triggering application of the aggravated assault guideline. "Serious" injury is defined in relevant part to include "injury involving ... the impairment of a function of a bodily member...." U.S.S.G. Sec. 1B1.1 at Application Note 1(j). Dailey was diagnosed with a fractured elbow and ordered to wear a sling, and testified that he was unable to write out the complaint he wished to file with the OHA police because of his injury. His injury thus unquestionably falls within the definition set forth by the Guidelines. Reese also asserts that the district court relied on "improper considerations" in concluding that this was an aggravated assault, namely, Reese's "prior history with violence" as a member of another police force. The court did remark upon Reese's history in the course of ruling that his assault on Dailey was aggravated. We are satisfied, however, that these observations played a negligible role in the court's determination of which was the proper guideline to apply. We discern no error.
 
 X
 
 137
 Appellants' convictions and the sentences imposed by the district court are AFFIRMED.
 
 APPENDIX
 
 138
 The district court instructed the jury as follows:
 
 
 139
 Count 1 charges the defendants with violating Sec. 241 of Title XVIII, United States Code. The relevant part of Sec. 241 reads as follows:
 
 
 140
 "If two or more persons conspire to injure, oppress, threaten or intimidate any inhabitant of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him by the constitutional laws of the United States, or because of his having so exercised the same, they shall be guilty of an offense against the United States."
 
 
 141
 The court then instructed the jury on conspiracy in general, and then returned to Sec. 241:
 
 
 142
 Sec. 241 as charged by this indictment has four elements to be considered as to each defendant. First, that the defendant agreed with one or more persons to injure, oppress, threaten or intimidate one or more victims. Second, that the defendant intended by the agreement to hinder, prevent or interfere with a person's enjoyment of a right secured by the Constitution or laws of the United States. Third, that one or more of the intended victims was an inhabitant of California, which means that the person was physically present in the state of California at the time of the deprivation. And, fourth, that the defendant acted under color of State law, which means that the defendant was acting in the official capacity as a police officer at the time of the deprivation.
 
 
 143
 The second element of the conspiracy offense is that the defendants intended by the conspiracy to interfere with individual's rights that were secured or protected by the Constitution and laws of the United States.
 
 
 144
 Count 1 charges that each of the defendants conspired to interfere with other individual's free exercise and enjoyment of three specific rights protected by the United States Constitution. The rights named in count 1 include the right, first, to be free from the deprivation of liberty without due process of law, which includes the right to be secure in their persons; that is the right to be free from the intentional use of unreasonable force by one acting under color of law. Two, to be free from the deprivation of liberty without due process of law, which includes the right not to have false evidence knowingly presented against him by one acting under color of law. And three, to be free from the deprivation of property without due process of law by one acting under color of law. Thus, in this case, if you find that the conspiracy was directed against either an inhabitant's right to be free from the use of excessive force by someone acting under color of law, or an inhabitant's right not to have false evidence knowingly presented against him by someone acting under color of law, or an inhabitant's right to be free from the deprivation of property without due process of law by someone acting under color of law, then you may find that the conspirators agreed to interfere with the rights secured by the Constitution of the United States.
 
 
 145
 You must be unanimous as to at least one of those objectives. An act was done knowingly [if] it's done voluntarily and intentionally, and not because of a mistake, or accident or other innocent reason.
 
 
 146
 The purpose of adding the word "knowingly" is to ensure that no one will be convicted for an act done because of a mistake or accident, or other innocent reason. As stated before, with respect to an offense such as charged in this case, specific intent must be proved beyond reasonable doubt before there can be a conviction.
 
 
 147
 The court then continued with more general conspiracy instructions. On the substantive counts, the court instructed as follows:
 
 
 148
 Counts 2 through 19 charge individual defendants with violating Sec. 242 of Title XVIII, United States Code. The relevant part of Sec. 242 reads as follows:
 
 
 149
 "Whoever under color of any law, statute, ordinance, regulation or custom willfully subjects any inhabitant of any state, territory, or district to the deprivation of any rights, privileges or immunities secured or protected by the constitutional laws of the United States, shall be guilty of an offense against the United States."
 
 
 150
 The government must prove beyond a reasonable doubt, four, and in some ... counts five elements to establish the offenses charged in counts 2 through 19.
 
 
 151
 First, the person upon who the alleged acts were committed must have been an inhabitant of a state, district or territory of the United States, here in the state of California as that term was defined earlier. Second, the defendant must have been acting under color of law, as defined earlier. Third, the conduct of the defendant must have deprived the victim of some right secured or protected by the Constitution of the United States. Fourth, the defendant must have acted willfully--that is, with a specific intent to violate the protected constitutional right. Fifth, in only the counts where it is charged, that is counts 2, 3, 5, 7, 8, 9, and 11 through 14, the offense must have resulted in bodily injury to the victim.
 
 
 152
 The third element to be proved is that the conduct of the defendant or defendants must have deprived the victim of a right secured or protected by the constitutional laws of the United States.
 
 
 153
 In addition to the rights that I already discussed, additional constitutional rights include the right to be free from false arrest and the right to be kept free from harm while in official custody or detention. I instruct you that all of these rights are rights secured and protected by the Constitution of the United States.
 
 
 154
 The fourth element is that the defendant must have acted willfully. I instruct you that an act is done willfully if it is done voluntarily and intentionally and with a specific intent to do something the law forbids. That is, with the intent to violate a specific protected right, the specific intent which a defendant must possess to be found guilty on a given count, depends on which right that count charges has been violated.
 
 
 155
 For the eight counts in which various defendants are charged with intentionally using unreasonable force, the requisite specific intent is the intent to use more force than is necessary under the circumstances. For the three counts charging false arrests, the requisite specific intent is the intent to arrest the victim without having probable cause to believe he or she committed a crime for which--the crime for which he or she was arrested.
 
 
 156
 For the two counts in which defendant Reese is charged with willfully causing false evidence to be presented in official criminal proceedings, the requisite specific intent is the intent to give false evidence against the victim.
 
 
 157
 For the two counts in which Defendant Broussard is charged with willful failure to keep a detainee from harm, the requisite specific intent is the intent to deliberately not take action to prevent an officer from assaulting the detainee.
 
 
 158
 For the three counts in which certain defendants are charged with stealing money from individuals who are under arrest or detention, the requisite specific intent is the intent to take and keep for the defendant's own use of the money which was in the possession of the detainee.
 
 
 159
 As noted before, it is not necessary for you to find that the defendants were thinking in constitutional or legal terms at the time of the incidents. Because a reckless disregard for a person's constitutional rights is evidence of a specific intent to deprive that person of those rights.
 
 
 160
 The court continued with other instructions regarding motive and bodily injury, and then defined reasonable force:
 
 
 161
 [E]valuating whether a law enforcement officer has used excessive force requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
 
 
 162
 The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.
 
 RYMER, Circuit Judge, concurring:
 
 163
 I write separately to indicate that I do not join in Part II as it is background only, and I concur in the judgment reached in Part IV because Broussard was a supervising officer who willfully permitted subordinate officers in his presence to assault a person in his custody, and took no steps to stop the assault, in violation of the well established right of persons detained by or in the custody of law enforcement officers to be free from harm at their hands.
 
 
 
 [1]
 Since we must view the evidence adduced at trial in the light most favorable to the government, see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), we present the facts accordingly
 
 
 [2]
 Garden pled guilty to the same conspiracy charge of which appellants were convicted. Yee testified that he left the Task Force shortly after it began to operate, because "there were things I observed and personality differences that I didn't feel I wanted to be part of." Barryer was fired less than two months after he was hired when he admitted to a deputy district attorney that he had falsified an arrest report. All three of these officers testified for the government at appellants' trial
 
 
 [3]
 This incident formed the basis for count two of the indictment, alleging the use of unnecessary force by Reese; count three, charging Broussard with failing to keep a detainee from harm; and count four, charging Houston with false arrest. On these charges, the jury found Reese and Broussard guilty; Houston was acquitted
 
 
 [4]
 This incident formed the basis for count nine of the indictment, alleging that Dwyer used unnecessary force; and count ten, charging Broussard with aiding false arrest. The jury found Dwyer guilty on count nine, but acquitted Broussard on count ten
 
 
 [5]
 This incident formed the basis for count 18 of the indictment, alleging that Reese intentionally presented false evidence. The jury found Reese guilty
 
 
 [6]
 This incident formed the basis for count 12 of the indictment, alleging the use of unnecessary force by Reese. The jury found Reese guilty
 
 
 [7]
 This incident formed the basis for counts five and six of the indictment, alleging that Houston used unnecessary force against Rosie Verduzco, then falsely arrested her; and count seven, charging that Broussard intentionally failed to keep Rosie Verduzco from being harmed by Houston. The jury returned guilty verdicts on counts five and seven; Houston was acquitted on the false arrest charge
 
 
 [8]
 On the basis of this conduct, Dwyer was charged in count eight of the indictment with using unnecessary force. He was found guilty
 
 
 [9]
 This incident formed the basis for count 19 of the indictment, alleging that Reese intentionally presented false evidence. The jury found Reese guilty
 
 
 [10]
 Count 17 of the indictment charged each appellant with theft in connection with this incident. The jury, however, was unable to reach a verdict, and the district court declared a mistrial on this count
 
 
 [11]
 This incident formed the basis for count 13 of the indictment, alleging that Dwyer used unnecessary force against Watkins. The jury found Dwyer guilty
 
 
 [12]
 Williamson, previously a regular patrol officer with the OHAPD, transferred to the Task Force shortly before this incident. He was charged under 18 U.S.C. Sec. 241 for his part in appellants' conspiracy, and entered a plea of guilty
 
 
 [13]
 This incident formed the basis for counts 14 and 15 of the indictment, charging Dwyer with the use of unnecessary force and theft respectively. The jury found Dwyer guilty on the count alleging unnecessary force, but acquitted him on the theft charge
 
 
 [14]
 This incident formed the basis for count 16 of the indictment, charging both Reese and Houston with theft. The jury voted to convict both officers
 During the undercover operation staged on November 22, 1989, the Task Force learned that it was under surveillance when a suspect revealed the presence of video cameras at the surveillance location. The operation therefore had to be terminated.
 
 
 [15]
 This incident formed the basis of count 11 of the indictment, alleging that Dwyer used unnecessary force against Wordlow. The jury found Dwyer guilty on this count
 
 
 [16]
 Although only four Justices subscribed to the plurality opinion in Screws, the reasoning of that opinion has been adopted by a majority of the Court in subsequent decisions. See Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966); Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974)
 
 
 [17]
 Section 241, in contrast to Sec. 242, does not by its terms require that a defendant be shown to have acted "willfully." Nonetheless, the specific intent analysis of Screws has been extended to apply to conspiracy prosecutions under Sec. 241. "It is established that since the gravamen of the offense under Sec. 241 is conspiracy, the prosecution must show that the offender acted with a specific intent to interfere with the federal rights in question." Anderson, 417 U.S. at 223, 94 S.Ct. at 2261. See Price, 383 U.S. at 806 n. 20, 86 S.Ct. at 1163 n. 20 (there is "no basis for distinction" between Sec. 241 and Sec. 242 with respect to the specific intent requirement). Thus the discussion that follows is relevant to our review of appellants' conviction on the conspiracy count under Sec. 241 as well as the substantive counts under Sec. 242
 
 
 [18]
 The district court's instructions are set forth in relevant part in an appendix to this opinion
 
 
 [19]
 The analysis that follows applies with equal force to a conspiracy prosecution under Sec. 241
 
 
 [20]
 See United States v. Bigham, 812 F.2d 943, 948 (5th Cir.1987):
 Shillingford [v. Holmes, 634 F.2d 263 (5th Cir.1981) ] was brought as a civil case under 42 U.S.C. Sec. 1983, in contrast to this criminal case under 18 U.S.C. Sec. 241, 242. That is of no significance here. Whether a case is brought on the civil or criminal side of the docket, the actionable conduct is deprivation of rights secured by the Constitution or laws of the United States. The culpable intent will vary from willfulness of a criminal charge to something less in a civil complaint, and it may vary according to the particular constitutional right infringed. Otherwise, between the criminal and civil statutes the courts recognize the intent of Congress to cover the same cases, though providing different remedies.
 (citations omitted).
 
 
 [21]
 Appellants also argue that Graham cannot be applied in a criminal case because it makes "criminal liability [turn] not upon the criminal intent of the defendant but the custodial status of the victim." Appellants opaquely suggest that this "makes no sense at all" and violates due process and equal protection. The argument is misguided. Graham locates the right to be free of excessive force in various specific constitutional guarantees. As a result, the mens rea required to violate a victim's rights by means of the application of excessive force varies with the circumstances, i.e., the right in question. See Bigham, 812 F.2d at 948 (noting different standards of culpable intent applicable to Eighth Amendment, substantive due process, and Fourth Amendment excessive force claims). However, the mens rea required to support the imposition of criminal liability for the violation of such rights is in all cases the same--that is, the specific intent required by Screws
 
 
 [22]
 Broussard emphasizes that these cases are factually distinguishable from his own. In Lynch, for example, a sheriff and his deputy arrested several blacks, then turned them over to a group of Ku Klux Klansmen who beat them. And in Catlette, a deputy sheriff "took very active and utterly unwarranted steps to subject his victims to ... indignities" at the hands of an angry mob. 132 F.2d at 907. We acknowledge that the conduct of these officers, involving as it did affirmative acts taken for the very purpose of exposing their victims to harm, is different from Broussard's--the jury found that Broussard "deliberately [did] not take action to prevent [Reese and Houston] from assaulting the detainee[s]" in their control. United States v. McKenzie, 768 F.2d 602 (5th Cir.1985), cert. denied, 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986), cited by the government, is also distinguishable, for there the jury might well have believed that McKenzie had himself beaten the citizen victim after he was removed from the police station
 So far as we can tell, Broussard is correct that this is the first federal case in which a law enforcement officer has suffered a criminal conviction because he deliberately failed to act to prevent an assault by another officer. Nonetheless, the principle that underlies all the above cases--namely, that individuals in the custody or control of law enforcement personnel have a right to be kept free from harm while they are so held--unquestionably applies here. This right demands not only that officers refrain from deliberately placing their victims in harm's way, but also that they take reasonable steps to assist those who are threatened with harm by others.
 
 
 [23]
 Grubbs and Wood were both civil actions under 42 U.S.C. Sec. 1983. We have already explained, however, that the command of the Constitution does not vary according to the procedural context in which it is given voice. See supra Part III.B. These cases are thus relevant in establishing the existence of the constitutional right here at issue. We rely on them for no other purpose
 
 
 [24]
 Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 206 n. 3 (1st Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2266, 114 L.Ed.2d 718 (1991); Archie v. City of Racine, 847 F.2d 1211, 1222-23 (7th Cir.1988) (en banc), cert. denied, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988); Jackson v. Pantazes, 810 F.2d 426, 430 (4th Cir.1987); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir.1986); Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir.1984), vacated and remanded, 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985), opinion reinstated in relevant part, 796 F.2d 1307 (10th Cir.), cert. denied, 479 U.S. 884, 107 S.Ct. 275, 93 L.Ed.2d 251 (1986); Ware v. Reed, 709 F.2d 345, 353 (5th Cir.1983); Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); Putman v. Gerloff, 639 F.2d 415, 423 (8th Cir.1981)
 
 
 [25]
 Although not strictly relevant to the question whether the right to be kept free from harm was specific and definite at the time of the events in question, we note that when Broussard was asked on cross-examination whether "[i]f you saw one of your officers using excessive force on a suspect, you would have an obligation to intervene," he acknowledged that he would, and further stated that he "knew" in 1989 that he had such an obligation
 
 
 [26]
 Broussard does not raise an insufficiency claim with respect to count three, involving Reese's assault on Dailey
 
 
 [27]
 Appellants do not raise the issue of variance in proof. "A variance in proof occurs when ... the evidence offered at trial proves facts materially different from those alleged in the indictment." United States v. Alvarez, 972 F.2d 1000, 1004 (9th Cir.1992) (citation and quotation marks omitted), cert. denied, --- U.S. ----, 113 S.Ct. 1427, 122 L.Ed.2d 795 (1993). Since the indictment here clearly set forth exactly those facts of unreasonable force during arrest that the government sought to prove at trial, this claim could not succeed
 
 
 [28]
 Houston was the beneficiary of a substantial downward departure based on the district court's finding of "sympathetic circumstances." He has thus elected not to appeal his sentence, and the government does not challenge the downward departure
 
 
 [29]
 The relevant provisions are now set forth in U.S.S.G. Sec. 1B1.2(d) at Application Note 5
 
 
 [30]
 Appellants argue that the district court erred in employing the Guidelines in effect at the time of sentencing rather than those applicable at the time of the offenses. The government maintains that, because of the interaction of changes to the conspiracy and aggravated assault guidelines, any error in this regard is irrelevant: the final guidelines calculations would be the same whether under the pre- or post-November 1989 version. Appellants acknowledge that this "assertion is correct ... if each substantive count was correctly grouped with a conspiracy count." Since we have concluded that the district court did not err in grouping the offenses, we need not decide which version of the Guidelines should have been employed
 
 
 [31]
 Under Sec. 2A2.2(b)(2), the offense level is increased by five "if a firearm was discharged," by four "if a dangerous weapon (including a firearm) was otherwise used," and by three "if a dangerous weapon (including a firearm) was brandished or its use was threatened." Under Sec. 2A2.2(b)(3), the offense level is increased "according to the seriousness of the injury sustained by the victim"--"Bodily Injury" rates a two-level increase, "Serious Bodily Injury" a four-level increase, and "Permanent or Life-Threatening Bodily Injury" a six-level increase
 
 
 [32]
 We are aware that in United States v. Hudson, 972 F.2d 504 (2d Cir.1992), the Second Circuit held that impermissible double counting had occurred where the use of a dangerous weapon was relied upon both to "increase" the base offense level by triggering application of the aggravated assault guideline, and to adjust that base level in accordance with Sec. 2A2.2(b)(3). We believe, however, that the reasoning of that decision is flawed, and that the contrary conclusions of the Fourth Circuit in Williams and the First Circuit in Newman are better guides here
 Fundamentally, the problem we perceive in Hudson is that it departs from a faulty conceptual premise, viz., that the use of a particular aspect of a defendant's conduct to identify the Guidelines section applicable to his offense may have the effect of "raising" or "increasing" his base offense level. See, e.g., id. at 505 ("Hudson's base offense level was effectively raised from 6 to 15" because his offense was classified as an aggravated assault rather than obstructing or impeding officers); id. at 506 ("the use of the dangerous weapon ... resulted in an increase in the base offense level by making the crime an aggravated assault").
 To say that the use of a weapon "increased" the base offense level, however, implies a comparison between what the base level is and what it would have been if Hudson had committed an assault without using a dangerous weapon with intent to cause bodily harm. But of what relevance is a comparison between what the defendant did and what he did not do? The question, after all, is whether the offense level fails properly to reflect the wrongfulness of the defendant's actual conduct because some particular aspect of that conduct has been "double counted." Whether the offense level associated with the defendant's actual conduct is higher than that which would have been associated with some sort of hypothetical conduct on his part has nothing to do with this question. We might as well say that the fact that the victims of Hudson's assault were not killed when he tried to run them over with his car effectively "decreased" his offense level from what it otherwise would have been.
 The relevant way to describe what is going on here is that the use of a weapon transformed Hudson's offense from a minor assault to an aggravated-assault-in-which-a-dangerous-weapon-was-otherwise-used. That we use a single sentencing factor "twice" to trace the effects of this transformation (first to distinguish minor from aggravated assaults, then to distinguish more and less culpable aggravated assaults) is merely an accidental by-product of the mechanics of applying the Guidelines. It is not impermissible double counting.